**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA,
    *Plaintiff*,

    v.

WILLIE NUNLEY,
    *Defendant.*

No. 3:99-cr-0264 (VAB)

**RULING AND ORDER ON MOTION TO REDUCE SENTENCE**

Willie Nunley ("Defendant") has moved to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i).

The United States (the "Government") opposes this motion.

For the reasons set forth below, Mr. Nunley's motion for sentence reduction is **GRANTED**.

Mr. Nunley's sentence is reduced to **time served, with five (5) years of supervised release**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

On February 3, 2000, Mr. Nunley, along with several other codefendants, was indicted on a number of charges related to a drug trafficking conspiracy including murder, drug crimes, and racketeering. *See* Superseding Indictment, ECF No. 36 (Feb. 2, 2000).

On November 20, 2002, after about six weeks of proceedings, Mr. Nunley's first trial ended in a hung jury and a mistrial was declared. *See* Tr. of Trial 11/20/02, ECF No. 1278 (Dec. 18, 2002).

---

[1] The Court assumes familiarity with the procedural history of this case, and therefore provides only a brief restatement.

On February 25, 2003, jury selection began for Mr. Nunley's second trial. ECF No. 1327 (Feb. 25, 2003).

On April 24, 2003, after about eight weeks of proceedings, a jury found Mr. Nunley guilty of racketeering in corrupt organizations ("RICO"), in violation of 18 U.S.C. § 1962(c) ("Count One"); RICO conspiracy, in violation of 18 U.S.C. § 1962(d) ("Count Two"); conspiracy to distribute and distribution of more than 1000 grams of heroin and 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 ("Count Five"); violent crimes in aid of racketeering ("VCAR") conspiracy to murder Kenneth Porter, in violation of 18 U.S.C. § 1959(a)(5) ("Count 13"); VCAR murder of Kenneth Porter, in violation of 18 U.S.C. 1959(a)(5) ("Count 14"); VCAR conspiracy to murder Lawson Day, in violation of 18 U.S.C. 1959(a)(5) ("Count 18"); VCAR attempted murder of Lawson Day, in violation of 18 U.S.C. 1959(a)(5) ("Count 19"); and use of a firearm in relation to the attempted murder of Lawson Day, in violation of 18 U.S.C. § 924(c) ("Count 20"). *See* Verdict Form, ECF No. 1408 (Apr. 24, 2003); Judgment, ECF No. 1489 (Sept. 3, 2003) ("Judgment").

On September 3, 2003, U.S. District Judge Peter C. Dorsey sentenced Mr. Nunley to a term of life without parole for each of Counts One, Two, Five, and Fourteen; a term of ten year for each of Counts Thirteen, Eighteen, and Nineteen; and a term of five years on Count Twenty. Judgment at 1. The sentences for Counts One, Two, Five, Thirteen, Fourteen, Eighteen, and Nineteen were to run concurrently with each other, and the five-year sentence for Count Twenty was to run consecutively with all others. *Id.* Judge Dorsey also sentenced Mr. Nunley to a three-year term of supervised release for Counts Thirteen, Eighteen, and Nineteen, and a five-year term of supervised release for Count Twenty, all to run concurrently. *Id.*

On September 8, 2003, Mr. Nunley filed a notice of appeal. Notice of Appeal, ECF No.

1499 (Sept. 8, 2003).

On December 29, 2008, the Court of Appeals affirmed Mr. Nunley's conviction and sentence. Mandate of the USCA, ECF No. 2272 (Dec. 29, 2008).

On December 6, 2024, Mr. Nunley filed a motion to reduce his sentence under the First Step Act. Mot. to Reduce Sentence, ECF No. 2789 (Dec. 6, 2024) ("Mot.").

On February 23, 2025, the United States filed a memorandum in opposition, opposing Mr. Nunley's motion. Memo. in Opp., ECF No. 2799 (Feb. 23, 2025) ("Opp.").

On March 10, 2025, Mr. Nunley filed a reply to the United States' opposition. Response/Reply, ECF No. 2800 (Mar. 10, 2025) ("Reply").

On July 16, 2025, Mr. Nunley file a Notice of Supplemental Update with two additional exhibits. Notice of Supplemental Update, ECF No. 2806 (July 16 2025) ("Supplemental Notice"); Exhibit DD, ECF No. 2806-1 (July 16, 2025); Exhibit C, ECF No. 2802 (July 16, 2025).

On July 23, 2025, the Court held a hearing on the motion to reduce Mr. Nunley's sentence.

## II.    STANDARD OF REVIEW

Under 18 U.S.C. § 3582(c)(1)(A), a court may modify a term of imprisonment in two circumstances: (1) "upon motion of the Director of the Bureau of Prisons" or (2) "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020) ("Until last December, a court could not modify a defendant's duly-

imposed sentence on compassionate release grounds unless it received a motion from the Bureau of Prisons asking that the court consider such modification. [A]s part of the First Step Act, . . . [a] court may now consider a motion for compassionate release made by a defendant who has exhausted his administrative remedies by petitioning the Director of the BOP to make such a motion, assuming the Director fails to act on the inmate's request within thirty days.").

To modify a sentence under 18 U.S.C. § 3582(c)(1)(A)(i), a court must find that the defendant has "exhaust[ed] administrative remedies by requesting such relief from prison authorities." *United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021). Then, the defendant must show "that his proffered circumstances are indeed 'extraordinary and compelling'" *Id.* Finally, a district court "must 'consider the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable.'" *Id.*  (quoting 18 U.S.C. § 3582(c)(1)(A)) (cleaned up).

## III.    DISCUSSION

Mr. Nunley argues that his rehabilitation, severe childhood trauma, unusually long sentence, and excessively harsh conditions of confinement he experienced "alone or in combination" constitute extraordinary and compelling reasons that warrant a reduction in his sentence. Mot. at 49. Mr. Nunley also argues that the section 3553(a) factors support a sentence reduction from a life sentence to a term of years between 30 and 37.5.[2] Mot. at 59, 72. Finally, Mr. Nunley states that he has exhausted all administrative remedies. *Id.* at 71.

The Government argues that Mr. Nunley has not demonstrated any extraordinary and compelling reasons warranting season reduction, Opp. at 14, and that the Section 3553(a) factors

---

[2] In his original motion, Mr. Nunley "requests that the Court reduce his sentence to a term of years between that of Leslie Morris (30 years) and Luke Jones (37.5 years)." Mot. at 5. In his reply, Mr. Nunley requests "time served or a term of years closer to 30 than 37.5 years." Reply at 19.

weigh against a reduced sentence, *id.* at 26. The Government does not challenge that Mr. Nunley has exhausted administrative remedies. *Id.* at 14.

The Court will address each argument in turn.

## A. The Exhaustion of Administrative Remedies

The parties do not dispute that the exhaustion requirement has been met. *See* Mot. at 11; Opp. at 14.

Mr. Nunley, through counsel, has submitted a request to the Bureau of Prison for a reduction in his sentence. Mot., Exhibit V, ECF No. 2789-19. The request was submitted on November 14, 2024, and more than thirty days have passed since its submission. *See* 18 U.S.C. § 3582(c)(1)(A) (requiring that "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility").

Accordingly, Mr. Nunley has satisfied the exhaustion requirement.

## B. The Extraordinary and Compelling Reasons

An extraordinary reason is one that is "most unusual" and "both powerful and convincing." *United States v. Fernandez*, 104 F.4th 420, 428 (2d Cir. 2024) (quoting *United States v. Jenkins*, 50 F.4th 1185, 1197 (D.C. Cir. 2022), then *United States v. Canales-Ramos*, 19 F.4th 561, 567 (1st Cir. 2021)). District courts have the discretion to "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker,* 976 F. 3d 228, 237 (2d Cir. 2020). And, "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'" *Id.* at 237–38 (quoting 28 U.S.C. § 994(t)) (emphasis in original).

Mr. Nunley argues that his "impoverished, violence-filled upbringing, extraordinary transformation, unusually long sentence, and severe conditions of incarceration" in combination constitute extraordinary and compelling reasons to reduce his sentence. Mot. at 42; *see also* Reply at 1 ("Mr. Nunley has argued that several factors, *in combination*, warrant a reduction in his case[.]" (emphasis in original)).

More specifically, Mr. Nunley details his upbringing in Bridgeport, Connecticut where he was exposed to drugs, violence, severe poverty, and parental abuse and neglect from a young age. *See* Mot. at 10–14. For example, at the age of nine, he took on a parental role for his younger sisters due to their parents' absence, and at age twelve, his father first gave him cocaine. *Id.* at 13.

He argues that "traumatized children grow into unhealthy adults" because people with adverse childhood experiences, such as being abused or neglected or witnessing poverty, are more likely to experience "chronic health problems, mental illness, substance use, and have difficulty with employment." Mot. at 51–52 (citing NAT'L CTR. FOR INJURY PREVENTION & CONTROL, DIVISION OF VIOLENCE PREVENTION, Fast Facts: Preventing Adverse Childhood Experiences, CDC (Apr. 6, 2022), *available at* https://www.cdc.gov/violenceprevention/aces/fastfact.html). And, that poverty is "associated with abnormal neural development" in childhood and a "chronic, toxic stressor such as poverty may change the parts of developing children's brains responsible for the processing of stress and emotion." Mot. at 52 (citing Early Life Stress Can Leave Lasting Impacts on the Brain, SCI. DAILY (June 27, 2014), *available at* http://www.sciencedaily.com/releases/2014/06/140627133107.htm). Thus, "Mr. Nunley's poor

decision-making, planning, and self-restraint," he argues, "were compounded by the trauma and poverty he experienced throughout his early life." Mot. at 53.

As to his "unusually long sentence," Mr. Nunley points to the "exceedingly rare" sentence of life in the federal system, even in murder cases. *Id.* at 56 (noting that the "average length of a federal sentence for murder over the past decade is approximately 22 years"). In the District of Connecticut specifically, Mr. Nunley states that he is one of 31 people serving life sentences. *Id.*

Mr. Nunley also argues that he has experienced "excessively harsh conditions of confinement" while at ADX Florence. *Id.* at 57. From 2012 to 2020, while incarcerated at ADX Florence, Mr. Nunley "spent twenty-three hours a day isolated in a cell by himself." *Id.* at 31, 57. His conditions allegedly "'rendered his sentence far harsher and more punitive than the Court had anticipated at sentencing'" *Id.* at 58 (quoting *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020)).

Finally, Mr. Nunley argues that "his remorse has driven him to lead a more peaceful and positive life." *Id.* at 50. While incarcerated, he has "pursued a wide range of programming, including 40 courses, several self-guided lessons, and, most notably, the Challenge Program." *Id.* He has also worked as a suicide companion. *Id.* And, in the past 13 years, he has had zero disciplinary infractions. *Id.* at 51. Mr. Nunley has also developed a close relationship with family and friends, including his daughter. *Id.* at 33. Mr. Nunley has also begun to address his past harms and has written Mr. Day a letter apologizing for the hurt he had caused. *Id.* at 41; *see also* Mot., Exhibit S, ECF No. 2789-16 (letter from Mr. Nunley to Mr. Day).

The Government argues that Mr. Nunley has not demonstrated any extraordinary or compelling reasons that warrant a sentence reduction. Opp. at 14. First, the Government points to

the seventeen disciplinary infractions that Mr. Nunley incurred during the first eleven years of

his incarceration, "including possession of a dangerous weapon, stabbing another inmate, [and]

being involved in the stabbing murder of an inmate." *Id.* The Government argues that Mr.

Nunley "deflects from his own responsibility" for these infractions. *Id.* at 15. The Government

also states that Mr. Nunley's "rehabilitation efforts do not rise to the level required for a sentence

reduction to time served." *Id.*

    With respect to Mr. Nunley's incarceration in ADX Florence, the Government argues that

Mr. Nunley "does not cite anything regarding this experience that was uniquely challenging as

compared to any other inmate housed at the facility." *Id.* "What Nunley cites in his motion," the

Government argues, "are the 'extreme conditions' he endured during his incarceration at

maximum security prisons" and "the general circumstances experience by all inmates in the

Control Unit of ADX Florence." *Id.* at 24. These conditions thus "do not constitute extraordinary

and compelling circumstances warranting relief." *Id.*

    As to Mr. Nunley's arguments about his exposure to childhood trauma, the Government

argues that "a difficult upbringing neither fully explains nor excuses the extreme violence that

Nunley engaged in" and that "[a] difficult upbringing is not an 'extraordinary and compelling

reason.'" *Id.* at 19–20. Rather, the Government argues, many youth in Bridgeport, Connecticut

have similar experiences and "yet, the overwhelming majority do not turn to murders and other

violent crime." *Id.* at 20. And, to the extent Mr. Nunley argues that his trauma impaired his

development, the Government counters that the Court "may not 'substitute the defendant's

relative immaturity for the actual age of minority.'" *Id.* at 21 (quoting *United States v. Reingold*,

731 F.3d 204, 215 (2d Cir. 2013)).

Finally, the Government argues that Mr. Nunley's life sentence for VCAR murder is not rare. *Id.* at 22. Specifically, the Government states that "among defendants sentenced to life in prison for VCAR murder, his sentence is not atypical, since Congress has deemed that crime deserving of a life in prison." *Id.*

In response, Mr. Nunley argues that reduction is warranted based on "several factors, *in combination* . . . not just that each factor standing on its own would be sufficient." Reply at 1. (emphasis in original)

The Court finds that extraordinary and compelling reasons exist.

First, Mr. Nunley's incarceration in ADX Florence and his current life sentence would not be sufficient independently to constitute extraordinary and compelling reasons for a reduction in Mr. Nunley's sentence.

While solitary confinement and the harsh conditions experienced by Mr. Nunley during his incarceration at ADX Florence warrant consideration, placement in a highly secure prison is not clearly "extraordinary" where Mr. Nunley's experience was not unique in comparison to the rest of his unit or somehow more punitive and harsher than the standard, intended conditions of that prison. *See, e.g., United States v. Shabazz*, No. CR12-0033JLR, 2022 WL 5247196, at *4 (W.D. Wash. Oct. 6, 2022) (declining to consider incarceration at ADX Florence to be an extraordinary and compelling reason for sentence reduction when defendant's "conditions of confinement at ADX Florence are not unique, as every defendant incarcerated at ADX Florence is subject to those same conditions"); *United States v. Alimehmeti*, No. 2024 WL 4880197, at *6 (declining to consider incarceration in ADX Florence's H-Unit to be an extraordinary and compelling reason for sentence reduction); *cf. United States v. Ramirez*, 571 F. Supp. 3d 40, 47 (S.D.N.Y. 2021) ("Regarding the admittedly harsh conditions of confinement created by the

COVID-19 pandemic, . . . these harsher conditions of confinement are not unique to the defendant, *i.e.*, 'extraordinary' for purposes of § 3582(c). If the challenging conditions of confinement caused by the pandemic warranted a sentence reduction here, essentially every inmate who has been in BOP custody at any time since March 2020 would be entitled to a sentence reduction." (citations omitted)).

Likewise, Mr. Nunley's "unusually long sentence" —a life sentence—alone would not constitute an extraordinary and compelling reason for reduction in his sentence. The VCAR murder of Mr. Porter, of which Mr. Nunley was convicted, still carries a statutorily mandated life sentence. *See United States v. James*, 239 F.3d 120, 127 (2d Cir. 2000) ("[W]e affirm the district court's decision that 18 U.S.C. § 1959(a)(1) carries a mandatory minimum sentence of life in prison."). As a result, it cannot be "extraordinary," "most unusual" or "far from common," *United States v. Fernandez*, 104 F.4th 420, 428 (2d Cir. 2024), for Mr. Nunley to have received a life sentence when Congress has determined that a life sentence is the minimum penalty for the crime he committed, both at the time it was committed and today,[3] even if Mr. Nunley's co-defendants have now had their life sentences reduced for reasons individual to them. *Cf. id.* at 429 ("In sum, there is nothing 'extraordinary' or 'compelling' about a sentence disparity that results from a co-defendant's decision to plead guilty and assist the government [when the

---

[3] As discussed further below and confirmed by the Second Circuit in *United States v. Halvon*, "[t]here is no indication in the statutory text that compassionate release is not available to inmates sentenced to mandatory minimum terms." 26 F.4th 566, 570 (2d Cir. 2022). In this case, however, the Court will not consider Mr. Nunley's life sentence to be an "extraordinary and compelling" reason that alone would warrant reduction, since it is not an "extraordinary" sentence for the crime he committed due to the current statutory minimum. *See United States v. Lespier*, No. 22-1372-cr, 2024 WL 208117, at *2 (2d Cir. Jan. 19, 2024) ("Moreover, the government's opposition emphasizes that the mandatory minimum sentence means that the length of Lespier's sentence is 'no outlier' and that '[a]n identical defendant sentenced for the first time in 2022 would still face the same mandatory minimum of life in prison.' If the district court intended to adopt these 'reasons stated in the Government's ... objection,' it did not abuse its discretion. . . . If the district court believed that it was categorically barred [in reducing a mandatory minimum sentence], contra *Halvon*, its order would have reflected a legal error." (citations omitted)).

defendant went to trial and received a mandatory life sentence]." (citations omitted) (cleaned up)).

Mr. Nunley's life sentence and the conditions at ADX Florence, however, add context to his rehabilitation. And his rehabilitation, in combination with Mr. Nunley's background and history of trauma, are sufficient to constitute extraordinary and compelling reasons to reduce his sentence. *See, e.g.*, *United States v. Ramsey*, 538 F. Supp. 3d 407, 424–26 (S.D.N.Y. 2021) (finding that "history of childhood abuse and neglect" and "compelling evidence of rehabilitation" contributed to finding that there were extraordinary and compelling reasons warranting a sentence reduction).

As detailed in his motion, Mr. Nunley's upbringing involved significant trauma, abuse, and neglect. *See* Mot. at 5–16. Raised in a low-income housing development that was "identified . . . as the epicenter of drug activity" in Bridgeport, Connecticut, *id.* at 9, both of Mr. Nunley's parents were addicted to cocaine, and "[f]or much of his early childhood, Mr. Nunley's parents 'were in jail, abusing drugs, or gone without notice.'" *Id.* at 10. His parent's substance abuse issues contributed to their abuse and neglect of Mr. Nunley and his sisters. *See id.* at 10 ("[Mr. Nunley's father] also drank heavily. He physically abused [Mr. Nunley's mother], and he became increasingly violent when he drank."). By age nine, Mr. Nunley would be responsible for caring for his younger sisters when his mother was gone from their home "for days on end." *Id.* at 12. By age twelve, Mr. Nunley's father had given him cocaine to try. *Id.* at 13. Around this time, Mr. Nunley began selling drugs with older men in his neighborhood. *See id.* at 14–15 ("Mr. Nunley began selling drugs, including crack, with a cousin and other kids he grew up with in the P.T. Barnum projects. Older men trained him by having him first serve as a lookout for older men in the neighborhood who were selling drugs. Older mentors supplied him with marijuana

11

and alcohol. Eventually, Mr. Nunley started selling marijuana and cocaine, and to protect

himself, he carried a handgun." (citations omitted)).

"Subjected to a history of childhood abuse and neglect, [Mr. Nunley] had less capacity

than many to resist invitations to criminal activity." *Ramsay*, 538 F. Supp. 3d at 424; *see also*

*United States v. Rengifo*, 569 F. Supp. 3d 180, 194 (S.D.N.Y. 2021) ("For instance, the extent of

a young person's immaturity is in part a function of his childhood experiences. Neurological

studies have concluded that severe childhood trauma is associated with changes to 'the

maturation of specific brain structures at particular ages' and a person's 'capacity to coordinate

cognition, emotion regulation, and behavior.' . . . It is therefore reasonable to infer that Rengifo

would exhibit immature patterns of thought at older ages than someone raised in a 'normal'

American context." (citing Bessel A. van der Kolk, "The Neurobiology of Childhood Trauma

and Abuse," 12 Child Adolesc. Psychiatric Clin. N. Am. 293, 294 (2003))). Mr. Nunley's

parents, struggling with their own substance abuse issues, were unable to provide for him, and

"[s]adly, he found in a drug trafficking gang a bastardized version of the support system his

family should have offered." *Ramsay*, 538 F. Supp. 3d at 425; *see also* Mot. at 15 ("According to

Mr. Nunley's Aunt Marie, 'It is not an exaggeration to say that no one ever bothered to take care

of him.'").

The Government relies on *Miller v. Alabama*, 567 U.S. 460 (2012), and *United States v.*

*Reginold*, 731 F.3d 204 (2d Cir. 2013), for the proposition that "courts may not 'substitute the

defendant's relative immaturity for the actual age of minority.'"  Memo. in Opp. at 21 (quoting

*Reginold*, 731 F.3d at 215). Such reliance is misplaced: Mr. Nunley is not arguing that his life

sentence is constitutionally barred due to his age at the time of the crimes. Rather, he is arguing

that his "unusually severe history of childhood and adolescent trauma" impacted his

development and contributed to his criminal behavior. Mot. at 51; *see also id.* 52–53 ("Thus, while it is a scientific fact that the brain has not finished developing by the age of 18 or even 25, one's individual childhood circumstances affect how their brain develops, as well as how their brain responds when faced with stressful or emotional situations."); *cf. United States v. Morris*, 2022 WL 3703201, at *9 (D. Conn. 2022) ("The *Miller* decision is inapposite, as Mr. Morris is not raising a constitutional argument, but rather is asking the Court to consider his age at the time he crime as committed when deciding whether to reduce his sentence.").

And, while "a difficult upbringing neither fully explains nor excuses the extreme violence that Nunley engaged in." Memo. in Opp. a 19, ultimately, the severe trauma, abuse, and neglect Mr. Nunley experienced from a young age did contribute to Mr. Nunley's path to criminality, and constitutes, along with his subsequent rehabilitation, an extraordinary and compelling reason warranting a reconsideration of his sentence. *See United States v. Ramirez*, 571 F. Supp. 3d 40, 50 (S.D.N.Y. 2021) ("From an extremely young age, Ramirez's life revolved around drug abuse and neglect. . . . While Ramirez['s] terrible upbringing does not in any way excuse his drug dealing and murders, it does explain how he came to 'choose' the path he did. Likely, it was the awful tale of Ramirez['s] young life that led Judge Sweet to believe a prison sentence of 48 years to be—by some degree—too long . . . .").

Since his incarceration, Mr. Nunley also has demonstrated meaningful rehabilitation. He has completed over forty courses, including the Challenge Program, an intensive 500-hour program that helps incarcerated individuals develop pro-social skills. Mot. at 34–35, 37. As Mr. Nunley states, the Challenge Program helped him realize "just how warped and destructive [his] previous ways of thinking and living were" and allowed him to "pinpoint and correct" those ways of thinking. *Id.* at 36 (citing Exhibit A at 2, ECF No. 2789-3 (Dec. 6, 202). Since

graduating from the program, Mr. Nunley now mentors current participants. *Id.* at 35. Mr.
Nunley additionally serves as a suicide watch companion, "monitor[ing] peers for any symptoms
of suicidal behaviors, depression, or other mental health symptoms," and providing emotional
support to inmates experiencing mental health crises. *Id.* at 36. Mr. Nunley's roles in mentoring
and providing support for other inmates evidences his rehabilitation. *See United States v.
Lespier*, No. 3:98-cr-102 (SVN), 2025 WL 213732, at *4 (D. Conn. Jan. 16, 2025) ("The Court
agrees with Lespier that, to have earned the trust of prison staff to watch over his fellow inmates
at a precarious point in their lives, is a testament to his reformed character.").

Mr. Nunley's efforts at rehabilitation are especially commendable considering that they
occurred in the highly punitive setting of ADX Florence, and at a time when Mr. Nunley had no
hope of release from prison. *See, e.g.*, *United States v. Gonzalez*, No.3:97-cr-204 (JCH), 2021
WL 1990041, at *4 (D. Conn. Apr. 23, 2021) ("It is clear that Gonzalez has done much to better
himself while incarcerated, despite serving a life sentence without the possibility of parole. The
court concludes that this record, if combined with other factors, could support a finding of
extraordinary and compelling circumstances."); *United States v. Millan*, No. 91-cr-685 (LAP),
2020 WL 1674056, at *9 (S.D.N.Y. Apr. 6, 2020) ("Mr. Millan's educational and rehabilitative
accomplishments are unique and distinctively important because he engaged in all such positive
activities without any tangible incentive other than self-improvement, given that his life sentence
meant that he could neither earn any 'good-time' credit nor receive any other sentence reduction
benefit. Simply put, Mr. Millan, in the face of a life sentence, assumed a positive outlook and
attitude towards life, sought to improve himself to the utmost extent possible and was motivated
to do so notwithstanding his circumstances.").

The Government argues that disciplinary events from 2007 and 2009, specifically the stabbing of one inmate and alleged involvement in the murder of another inmate demonstrate that Mr. Nunley's "rehabilitation efforts do not rise to the level required for a sentence reduction."[4] Memo. in Opp. at 16. Notably, however, Mr. Nunley has not had any disciplinary infractions in the last thirteen years, and as other courts in this District have recognized, rehabilitation that "d[oes] not happen instantly, but has instead occurred over time" can still be considered worthy of a reduction in sentence. *Lespier*, 2025 WL 213732, at *4; *see also id.* ("Moreover, Lespier has worked for UNICOR for more than twelve years, and has not sustained a disciplinary ticket for eleven years. This last achievement further supports his argument of rehabilitation, as he has sustained eleven disciplinary tickets over the earlier course of his incarceration; that he has remained ticket-free for more than a decade corroborates his argument that he has changed over time."); *Morris*, 2022 WL 3703201, at * 9 (granting motion to reduce sentence where defendant had disciplinary record that included a stabbing, but had "demonstrated rehabilitation while in prison, especially since 2017").

Perhaps most importantly, Mr. Nunley has demonstrated an acceptance of responsibility for his crimes and the harms he has caused, and has taken steps towards beginning a restorative process with Mr. Day. *See Lespier*, 2025 WL 213732, at *6 ("Critically, he has acknowledged,

---

[4] Mr. Nunley states that he was not involved with this murder. *See* Mot. at 28 (noting that Mr. Nunley was not prosecuted for the murder and that the individual charged with the murder stated that Mr. Nunley did not know of his plan). Since Mr. Nunley was never formally charged or prosecuted (and there is evidence in this record that he did not commit the alleged offense), as well as the fact that the incident occurred over a decade ago, this incident is not a sufficient basis to question whether Mr. Nunley's rehabilitation has been extraordinary and compelling. *See Morris*, 2022 WL 3703201, at * 9 ("[A] disciplinary record while in prison is not a strict bar to obtaining relief under the First Step Act."). As to the other stabbing incident, the inmate stabbed by Mr. Nunley has written a letter of support of his release stating: "We got along and I appreciated his attitude and way of getting along. There are lots of personalities that a prisoner has to deal with when doing time. Some are harder than others. In my book, Willie Nunley wasn't one I had concerns about. I respect his efforts now to try and get home. I hope you grant him that opportunity." Exhibit P, ECF No. 2791 (Dec. 6, 2024). And, in any event, this incident should be—and has been—placed in context, along with Mr. Nunley's exemplary disciplinary record for well over a decade, and other relevant matters.

for the first time, his role in murdering [the victim.] . . . Lespier has expressed responsibility and

genuine remorse for his actions. The Court does not simply take Lespier's word: his efforts at

rehabilitation while in custody corroborate the sentiments expressed in his letter."); *cf. Gonzalez*,

2021 WL 1990041, at *5 (ultimately denying relief where defendant "continue[d] to deny full

responsibility" and noting that "accountability lies at the heart of rehabilitation").

      After seeking permission from Mr. Day through counsel, Mr. Nunley wrote a letter to Mr.

Day apologizing for the shooting and recognizing the grave impact his actions had on Mr. Day's

life. Mr. Nunley wrote "One thing I believe now, and try to practice, is that a real man holds

himself accountable and tries to make amends to those he has hurt. I am certainly not asking you

to forgive me, Lawson, but I am offering you my apology and my word that I respect you,

appreciate you for keeping on all these years, and wish nothing but the best for you." Exhibit S,

ECF No. 2789-16 (Dec. 6, 2024) After receiving Mr. Nunley's letter, Mr. Day wrote to the Court

that he hoped to have an opportunity in the future to have a direct conversation with Mr. Nunley

and that the was "confident that the apology, remorse and understanding that [Mr. Nunley]

offered [him] through his letter is genuine." Exhibit Y at 5, ECF No. 2795 (Dec. 10, 2024).

      Mr. Nunley's acceptance of responsibility, as well as his efforts in prison to demonstrate

a significant rehabilitation, constitutes an extraordinary and compelling reason for a reduction in

sentence in combination with his upbringing and history of trauma. *See Millan*, 2020 WL

1674058, at *7 (noting that "legislators' use of the modifier 'alone' [in 28 U.S.C. § 994(t)]

evidence[d] that they believed that rehabilitation is relevant to the question of whether a sentence

should be reduced and that rehabilitation, when considered together with other equitable factors,

could constitute 'extraordinary and compelling reasons' for a sentence reduction").

Accordingly, the Court concludes that Mr. Nunley's upbringing and rehabilitation constitute extraordinary and compelling reasons to reconsider his sentence in accordance with the Section 3553(a) Factors.

## C. Section 3553(a) Factors

Under Section 3553(a), the Court "must impose a sentence sufficient, but not greater than necessary, to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (2) afford adequate deterrence, (3) protect the public from further crimes of the defendant, and (4) provide the defendant with training, medical care, and other treatment in the most effective manner." *United States v. Colon*, No. 3:97-cr-48 (SRU), 2020 WL 6049215, at *6 (D. Conn. Oct. 12, 2020) (citing 18 U.S.C. § 3553(a)). The Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant." *Id.* (citing 18 U.S.C. § 3553(a)(1)). Each factor should be considered "in light of post-sentencing factual developments." *United States v. Rose*, 379 F. Supp. 3d 223, 231 (S.D.N.Y. 2019).

Mr. Nunley recognizes that the offenses he committed were "grave" and argues that a sentence between 30 years and 37.5 years "reflects the seriousness of his offense, promotes respect for the law, and provides just punishment." Mot. at 59. Mr. Nunley also argues that his childhood adversity, need for rehabilitation, and the sentencing disparity between himself and his co-defendants supports a reduction in his sentence. *Id.* at 63–65. Additionally, Mr. Nunley states that he has a release plan and will not recidivate. *Id.* at 67–68.

The Government argues that the Section 3553(a) factors weigh against a reduction in Mr. Nunley's sentence. Memo. in Opp at 26. The Government points to the severity of Mr. Nunley's crimes, particularly his involvement in the murder of Mr. Porter and his attempted murder of Mr. Day, and the need for just punishment and respect for the law. Memo. in Opp at 29–30. The

Government additionally argues that Mr. Nunley's upbringing and any rehabilitative efforts do not constitute mitigating circumstances that suggest a reduction in his sentence is warranted. *Id.* at 32. Finally, the Government emphasizes the "individualized" nature of sentencing, and argues that the individual circumstances of Mr. Nunley's crimes suggest that, if reduced at all, Mr. Nunley's sentence should be at least commensurate with that of Luke Jones, a co-defendant who was resentenced to 450 months. *Id.* at 35–36.

In response, Mr. Nunley argues that Mr. Nunley is deserving of a sentence reduction similar to that of Leslie Morris, a co-defendant who was resentenced to 360 months, rather than Mr. Jones, who has been considered the "worst of the lot." Reply at 15–16.

The Court agrees.

The murder of Kenneth Porter and attempted murder of Lawrence Day are serious crimes that have caused a significant and lasting impact on the family and friends of Mr. Porter and Mr. Day himself.

While Mr. Porter's relatives chose not to appear at the hearing in this case, Mr. Porter's cousin previously spoke at the hearing of Mr. Morris, describing how her family "had our lives torn apart" by the murder of Mr. Porter, and stating that the family was "forever tortured by Kenneth's horrifying murder." Tr. at 79:25–80:2, ECF No. 2775 (Apr. 19, 2023); *see also* Memo. in Opp. at 29 (describing testimony from the family of Mr. Porter) ("She described how her family was 'living a full life sentence. We live with the consequences of this man's action every day. It does not end for us after, what, 21 years, 20 years. It continues until the day we die.'" (citing Tr. at 81:8–12)). And, as Mr. Day noted in his letter to Mr. Nunley, he suffered "terrible injuries" from being shot, and "still ha[s] flashbacks to that incident." Exhibit Y at 4, ECF No. 2795 (Dec. 10, 2024).

18

As this Court recognized before, "[n]o sentence—even the one originally given—can make the family of Kenneth Porter whole for their loss," *Morris*, 2022 WL 3703201, at *12, or relieve Mr. Day of his lasting injuries. A lengthy sentence is thus necessary to account for the seriousness of the offense and provide for just punishment.

But, in addition to the seriousness of the offense, Mr. Nunley's extensive rehabilitation "bears directly on the District Court's overarching duty to 'impose a sentence sufficient, but not greater than necessary,' to serve the purposes of sentencing." *Pepper v. United States*, 562 U.S. 476, 492–93 (2011) (quoting 18 U.S.C. § 3553(a)); *see also id.* at 491 ("[E]vidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing. . . . [T]he extensive evidence of Pepper's rehabilitation since his initial sentencing is clearly relevant to the selection of an appropriate sentence in this case."). Particularly, evidence of Mr. Nunley's rehabilitation suggest a limited risk of recidivism and that prolonged incarceration is not necessary to protect the public from further criminal acts. *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 59 (2007) ("The District Court quite reasonably attached great weight to Gall's self-motivated rehabilitation, which was undertaken not at the direction of, or under supervision by, any court, but on his own initiative. This also lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts.").

The Court also must consider the sentence disparities between Mr. Nunley and his co-defendants in this case. *See* 18 U.S.C. § 3553(a)(6) ("The court, in determining the particular sentence to be imposed, shall consider-- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."). At this

time, several of Mr. Nunley's co-defendants have been given a reduced sentence, including Mr. Jones and Mr. Morris who have both had life sentences reduced to a term of years. *See Morris*, 2022 WL 3703201 (reducing life sentence to 360 months); *United States v. Luke Jones*, No. 3:99-cr-264-1 (VAB), 2020 WL 2791862 (D. Conn. May 29, 2020) (reducing life sentence to 450 months); *see also United States v. Jones*, No. 3:99-cr-264-6, 2019 WL 4933578 (D. Conn. Oct. 7, 2019) (reducing life sentence of Lyle Jones to time served); *United States v. Harris*, 3:99-cr-264-4 (VAB), 2020 WL 132436 (D. Conn. Jan. 13, 2020) (reducing life sentence to time served). In resentencing Mr. Morris, the Court recognized that Mr. Jones, the leader of the gang, had been resentenced to 450 months, and that, in comparison, Mr. Morris's "age at the time of his crimes" and "subordinate role" supported a sentence of 360 years. *Morris*, 2022 WL 3703201, at *12.

While Mr. Nunley was not just older than Mr. Morris at the time of his crimes, but also directed his actions, *see Morris*, 2022 WL 3703201, at *6 ("According to Mr. Morris, he was pressured by Willie Nunley . . . ."), his time in prison has been particularly punitive, due to his eight years in near-solitary confinement at ADX Florence. Yet, despite the severity of Mr. Nunley's term of incarceration, the depth of his rehabilitation is extraordinary by any measure; perhaps best reflected in his efforts to atone for the harms caused to Mr. Day, and to forge a meaningful relationship with him.

Indeed, at the motion hearing, Mr. Day testified to his appreciation for Mr. Nunley's efforts, and argued in support of his early release. Even without similar expressions of support from the family of Kenneth Porter, Mr. Nunley's efforts are both noteworthy and commendable.

Thus, given these particular—and unique—circumstances, a sentence for Mr. Nunley close to or at the 360 months of Mr. Morris, rather than the 450 months of Mr. Jones, is warranted.[5]

As a result, in consideration of each of the Section 3553(a) factors, Mr. Nunley's sentence on all counts shall be reduced to time served. This sentence reflects the seriousness of Mr. Nunley's offenses and is "sufficient, but not greater than necessary" to achieve the statutory goals of sentencing. 18 U.S.C. § 3553(a).

Accordingly, the motion to reduce Mr. Nunley's sentence will be granted, and his sentence will be reduced to time served, with five (5) years of supervised release to follow.

## IV.    CONCLUSION

For the reasons explained above, Mr. Nunley's motion for sentence reduction is **GRANTED**.

Mr. Nunley's sentence is reduced to **time served, with five (5) years of supervised release to follow.**

The Clerk of Court is respectfully directed to file an amended judgment.

**SO ORDERED** at New Haven, Connecticut, this 25th day of July, 2025.

   /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge

---

[5] Mr. Nunley has a comprehensive re-entry plan in place that includes a 180-day "residential work-therapy program" with the Salvation Army's Adult Rehabilitation Center. Supplemental Notice at 4; *see also* Comprehensive Reentry/Treatment Plan, Exhibit T, ECF No. 2789-17 (Dec. 6, 2024) (describing full plan for re-entry including "housing, medical, mental health, and employment needs"). Mr. Nunley has been offered placement in this rehabilitation program through September 30, 2025. Supplemental Notice at 4. A sentence closer to 360 months thus serves the additional purpose of facilitating Mr. Nunley's participation in this program and his transition from incarceration.